Argued March 30; reversed July 6; rehearing denied September
13, 1938

# STATE SAVINGS AND LOAN ASSOCIATION *v.*
# BRYANT
(81 P. (2d) 116)

Department 2.

*Walter L. Tooze,* of Portland (Jaureguy & Tooze, of Portland, and E. K. Piasecki, of Salem, on the brief), for appellant.

*Allan G. Carson* and *Custer E. Ross,* both of Salem (Oscar Hayter, of Dallas, on the brief), for respondent.

ROSSMAN, J.  This is an appeal by the State Savings and Loan Association (plaintiff) from a judgment in favor of the defendant, C. C. Bryant, as receiver for the First National Bank in Salem, an insolvent national banking association. The judgment awards the plaintiff nothing upon its claim of $30,330.88 against the defendant, but grants the latter a recovery of $3,239.50, together with interest, attorneys' fees and costs upon his counterclaim against the plaintiff. The complaint, in the form of an action for money had and received, alleges that the plaintiff State Savings

and Loan Association deposited with the bank, prior to its insolvency, a large sum of money and that all except $30,330.88 was returned. It avers that the bank remains indebted to the plaintiff in the sum just mentioned and demands judgment for that amount. The answer admits that the bank, prior to its insolvency, received from the plaintiff the sums of money aforementioned, but avers that later it honored plaintiff's checks drawn upon the account in the amount of $30,330.88, charged the account with that sum of money, and that thus the balance mentioned in the complaint was extinguished. Next, the answer alleges the counterclaim upon which judgment was entered. The reply, in addition to denying the averments of the answer which set forth that the bank honored plaintiff's checks in the sum of $30,330.88, alleges that the checks were signed by officers of the plaintiff who had no authority to do so, and that the bank was aware of their lack of authority. Further, the answer states that the checks were not issued on account of any debt of the plaintiff, that their proceeds were kept by the bank, and that the plaintiff received no consideration for the checks. Finally, the reply alleges a defense of illegality which we shall mention in detail later. The judgment of the circuit court is based upon general findings favorable to the defendant. The appeal affects the plaintiff's claim only—not the counterclaim.

To render the issues more readily understandable as we proceed with a review of the evidence, we add the following. The plaintiff, as the defendant admits, had a commercial account with the bank and claims that a balance of $30,330.88 remained in the account when insolvency closed the bank's doors. The defendant insists that the balance was extinguished by checks drawn against the account and honored by the bank in the

total of $30,330.88. The plaintiff claims that these checks were not chargeable to the account because (1) they were a part of a fraudulent scheme perpetrated by the bank to divert the balance to the bank's avail; (2) the plaintiff had not authorized the issuance of the checks; and (3) the transactions out of which the checks arose were prohibited by a statute of this state and were therefore illegal. The latter defense is predicated upon the following. The bank owned a leasehold estate. It sold it for $62,000 and the aforementioned checks were drawn in part payment of that price, being the only part of the purchase price that was paid. The plaintiff's net assets at the time totalled $426,280.43. Section 25-311, Oregon Code 1930, prohibits savings and loan associations from using more than ten per cent of their net assets in the purchase of real estate to house their business offices. The defendant denies that it sold the least to the plaintiff, and insists that the purchaser was another concern entitled the Mortgage Investment Company. We shall confine the review of the evidence to the issue of illegality only; mention of other evidence is incidental. Thus, it is admitted that (a) at one time plaintiff's account with the bank held $30,330.88; (b) checks in that amount, over the plaintiff's name as maker, were drawn; (c) the bank sold a lease; and (d) the aforementioned checks paid for a part of its purchase price. The issues remain: (1) Was the plaintiff the purchaser of the lease; (2) if so, was the transaction illegal; and (3) was the bank aware of these facts.

November 15, 1929, the bank, of which the defendant is receiver, purchased the assets and assumed the liabilities of the Salem Bank of Commerce. In so doing, it acquired the furniture and fixtures of the purchased bank and also the lease upon the building in which the

latter bank had conducted its business. May 17, 1930, the Comptroller of the Currency wrote to the First National Bank, to which we shall hereafter refer as the bank, and, referring to the lease, furniture and fixtures, stated in part as follows:

"The expenses over income derived therefrom run the amount at which these assets are carried up to $67,209.66. The examiner reports that negotiations are under way having in view the organization of a separate company to take over these assets. It is hoped organization will be completed soon and that you can, in a short time, report removal of these objectionable items. A cash transaction should be arranged if at all possible, but, if not, at least a substantial initial cash payment should be required and subsequent cash installments at regular and not infrequent intervals. Please write this office on June 11 and advise how far you have progressed in this matter by that time."

Apparently, this lease had been a source of concern even before the bank received the above letter, for Mr. E. F. Slade, president of the bank, testified: "It wasn't a desirable bank asset and for that reason it was objected to by the Comptroller of the Currency; in acquiring the assets of the Salem Bank of Commerce it was objected to."

The Bank of Commerce building was a five-story-and-basement structure, fifty by one hundred and six feet in size, favorably located in the city of Salem. It was owned by one B. L. Steeves who, on March 27, 1911, as lessor, signed a lease conveying a leasehold estate in the property (with the exception of three rooms on the second floor) for fifty years to the Salem Bank and Trust Company of which the Salem Bank of Commerce became successor. As subsequently modified, the lease required payment by the lessee of a monthly rental of $550 and bound it to discharge "all

taxes, betterments, water rates, assessments and levies and charges whatsoever which may be assessed or imposed upon or in respect of the demised premises or any part thereof during the term hereby created; and will also keep all and singular the premises in such repair, order and condition as the same are in at the commencement of the said term.'' The lease required the lessee to provide insurance covering the structure and to assure its performance of the covenants of the lease with a bond in the sum of $10,000. The Salem Bank of Commerce, before it was absorbed by the First National Bank, occupied a portion of the ground floor of this building. That space became vacant after the amalgamation. The four upper floors of the building were rented to office tenants.

After the bank acquired the aforementioned lease it opened in its ledger an account which it termed ''Bank Building Account.'' The first entry in this account is dated November 16, 1929, and indicates that there was in the account at that time $74.61. December 3, 1929, it reached its maximum, $142.11, but upon the same day disbursements extinguished the balance and produced an overdraft of $2,151.97. From then on the account continuously showed an overdraft. For instance, January 2, 1930, it was $3,071.41; a month later it was $4,034.18, and on October 10, 1930, it was $4,211.76. Upon the latter date the bank made the aforementioned sale of the lease. Thus, in eleven months, a loss of over $4,300 was suffered.

The plaintiff, a building and loan association, organized pursuant to the provisions of § 25-301 etc., Oregon Code 1930, was engaged in business in Salem when the First National Bank acquired the above lease. The Mutual Savings and Loan Association was a similar organization also engaged in business in Salem.

The Mortgage Investment Company, with headquarters in Portland, was, according to its executive head, "a holding corporation and general finance company." It had acquired control over several building and loan associations and, by virtue of contracts with them, managed their affairs for fees amounting to two and one-half per cent of their net assets.

When the bank received the aforementioned letter from the Comptroller of the Currency it was already trying to dispose of the lease. The letter stimulated its efforts. It was necessary, of course, to find some concern which had need for the vacant space, equipped, as it was, with a vault and other fixtures adapted to the needs of a financial concern. About this time, that is, in the spring of 1930, negotiations were under way between the Mortgage Investment Company and the plaintiff whereby the former sought to gain control over the latter. Apparently the interest of the Mortgage Investment Company was due to the circumstance that it would appoint itself the managing agent of the two associations upon gaining control over them, and was quickened through the fact that competitors were making offers to the two associations. Then, too, Mr. Slade was contemplating the formation of a local company to acquire control over the two associations.

Mr. Jay S. Moltzner was vice-president of the Mortgage Investment Company. Mr. Slade, previously mentioned, was not only president of the bank but also a director of the plaintiff and a member of its executive committee. The respondent's brief states that he "was an active officer of appellant." The negotiations between the Mortgage Investment Company and the plaintiff came to the attention of Slade who thereupon assumed charge of them on behalf of the plaintiff. Later developments seem to warrant a belief that

Slade's interest was due, in part at least, to a hope that the transaction would afford an opportunity for a sale of the lease. Shortly the negotiations brought Moltzner to Salem where he conferred with Slade. On April 24, 1930, the Mortgage Investment Company made a written offer to the plaintiff, through Slade, stating:

"The undersigned corporation will pay you a premium of five per cent for the net assets of said association. * * * Further, we shall ask that you go through the process of conversion from a mutual association to a reserve fund company which can be done very easily and without great expense * * *. The transaction will be further conditioned, of course, by the approval of the state corporation department."

Before making reply to this letter Slade sought to induce Moltzner, as the representative of his various companies, to become interested in the lease and furniture. He set a price upon the lease and furniture of $62,000, payable in monthly installments. In the meantime, a representation was made to Moltzner, which he believed, that the building was returning a net profit of $200 a month, with the banking quarters vacant. Moltzner's interest in Slade's proposals was due, not only to a belief that the vacant quarters, although too large, could be used as a home for the two local building associations, if the latter were acquired, but also to the fact that Slade, according to Moltzner, made purchase of the lease "a condition precedent to our going through with the purchase of the two associations." The letter of April 24, 1930, was succeeded by some discussions. May 14, 1930, the Mortgage Investment Company made offers in three different letters to the bank and to the two associations. The one to the plaintiff was "for the purchase and control of your savings and loan association." Its terms were

similar to those expressed in the letter of April 24. However, the new offer added: "The purpose of the transaction is to consolidate the State and Mutual Savings and Loan Association * * *. It is proposed to house the institutions in the Bank of Commerce Building. * * * It is understood that any and all operating contracts or agreements now outstanding between the associations and any corporation or individual will be assigned to the Mortgage Investment Company." The offer to the Mutual Savings and Loan Association was precisely the same as the one to the plaintiff. The third offer of that day was to the bank. From it, we quote:

"We hereby agree to purchase lease, furniture and fixtures of the Bank of Commerce Building at a price of Sixty-Two Thousand Dollars ($62,000.00), on the following conditions: As and when the directors of the State Savings and Loan Association and the Mutual Savings and Loan Association have accepted and acted in accordance with our letter to the respective associations dated May 14, 1930, * * *"

October 2, 1930, the Mutual Company rejected the offer to it. That development was of material consequence because it affected a source from which the purchase price of the lease could be derived. The plaintiff's net assets at that time were $426,280.43, but its assets combined with those of the Mutual would have aggregated one million dollars. As already stated, Moltzner had expected to house those two companies in the vacant bank quarters. Section 25-311, Oregon Code 1930, in referring to building and loan associations, states:

"No such association shall use more than 10 per cent of its net assets in acquiring real estate for its business location."

The bank's price of $62,000 for the lease was much greater than ten per cent of the plaintiff's net assets ($426,280.43), but was less than ten per cent of one million dollars. The Mortgage Investment Company had become involved in a financial transaction in Seattle to such an extent that it possessed no funds available for the acquisition of the lease. Moreover, it had never intended to pay for the lease out of its own funds. At this juncture a conference occurred between the state corporation commissioner, Slade and Moltzner. Concerning it both of the individuals just mentioned testified. Moltzner swore that the corporation commissioner favored the completion of the transaction, that is, that the Mortgage Investment Company acquire control over the plaintiff and that the latter take over the lease and furniture at the agreed price, $62,000. According to Moltzner, the commissioner recommended that the plaintiff enter the lease upon its books as an investment of ten per cent of its net assets and that the balance be deemed the value of the furniture. We have not overlooked the defendant's argument that this conference occurred after, not before, the contract was executed. However, Slade frankly answered when questioned concerning this conference: "Q. That was prior to the final culmination of the transaction, was it not? A. To the final culmination? Q. Yes. A. Yes, it would be."

After the conference of Slade and Moltzner with the corporation commissioner a contract of sale, dated October 10, 1930, transferring the lease and fixtures, was signed. It expressed a consideration of $62,000, payable $5,000 concurrently with the execution of the instrument, $10,000 thirty days later, and the balance in monthly installments of $4,000 each. The instrument bears the signature of the bank, as vendor, and of the

Mortgage Investment Company, as vendee. It is neither signed by nor mentions the plaintiff. The following is quoted from the instrument:

"The vendor herein agrees to give good and sufficient bill of sale of all bank fixtures and equipment now contained in the building herein mentioned to the purchaser when the terms of payment shall have been fully complied with."

The instrument makes no other mention of the furniture and fixtures except the following:

"The following is a list of articles of furniture left in the Salem Bank of Commerce Building and to be delivered under the terms of the contract signed by the Mortgage Investment Company as of this date:

Red mahogany table with six chairs
One typewriter desk and chair
Three walnut desks
Seven arm chairs
One cuspidor
Dictagraph inter-telephone system comprising six boxes and switchboard."

The Salem Bank of Commerce had installed a large concrete vault in the building. In addition it had improved the exterior of the first floor with terra cotta facings and the interior of the banking quarters with marble floors, etc. In a report of its condition, published October 4, 1929, it entered under the head of "Resources" the following:

Banking house ............................................... $48,500
Furniture and fixtures ............................... 19,931

It appears reasonable to assume that the concrete vault and marble floors were non-removable fixtures; at any rate, the lease contains no provision for their removal. Moreover, the instrument of October 10, 1930, makes no reference to them and, through its specific

mention of the above items, excludes the vault, terra cotta, marble floors, etc. These circumstances are persuasive evidence that the parties deemed the vault, terra cotta, marble floors, etc. fixtures which had become the property of the lessor. It must be evident that the only items in the form of furniture and fixtures affected by the conveyance were those mentioned in the instrument itself; that is, the directors' table, chairs, typewriter, cuspidor, etc. No one contends that they were worth $19,931. Apparently, their value was a modest one.

Concurrently with the execution of the contract the initial payment of $5,000 required by it was made. This payment, or rather a substitute for it, was made in the following manner. The plaintiff lacked the necessary cash. Thereupon the Guardian Building and Loan Association, a subsidiary of the Mortgage Investment Company, gave its thirty-day note to the bank for $5,000 which the latter accepted as the first payment upon the $62,000 obligation. December 1, 1930, the plaintiff gave its check for $5,000 which extinguished this note. Thereafter the following payments were made at intervals of approximately one month: $10,000, $4,000, $4,000, $2,000, $2,000, 2,000 and $1,330.88. The payments total $30,330.88. It is agreed that all of these eight payments were made out of the plaintiff's moneys drawn out of its deposit with the First National Bank. They constitute the subject-matter of plaintiff's alleged cause of action. Each of the payments was made through the medium of a check bearing the signature of the plaintiff signed by its vice-president and secretary. Plaintiff's by-laws, referring to its secretary-treasurer, states: "He shall pay out only such money as ordered by the directors, unless otherwise provided

for in the By-laws or orders signed by the president and countersigned by him." These checks do not bear the signature of the plaintiff's president. Neither the minutes of the meetings of the plaintiff's stockholders nor of its directors make any mention whatever of the aforementioned transactions except the conversion of the plaintiff from a mutual into a reserve fund association. Likewise, the minutes contain no authorization for the above disbursements. When the above transaction was concluded no one but Slade knew that the plaintiff was expected to pay the purchase price of the lease. We realize that the defendant's brief denies that Slade knew that the plaintiff was the purchaser. Apart from "an impression" of having spoken to one of his fellow directors in the plaintiff association concerning some phase of the transactions, Slade conceded that in handling the transfer of the lease he discussed it with none of them. At any rate, when the bank demanded from the plaintiff payment of the initial installment Mr. J. J. Elliott, secretary of the plaintiff, was greatly surprised. As a witness, he testified: "I didn't think the Savings and Loan was obligated, and I didn't think they should make the payment." That being true, he protested to Slade and to the cashier of the bank, as well as to others. However, following the transaction of October 10, 1930, four of the officials of the Mortgage Investment Company were substituted as directors for some incumbents who resigned, and at the same time Moltzner was elected president of the plaintiff. Shortly after Elliott had manifested his objections they were overruled by instructions which came from one of the new officials, and Elliott then issued the check. Nevertheless, he never made the bookkeeping entries concerning the lease and fixtures which the corporation commissioner had recommended.

Mr. Moltzner swore that from the very outset it was contemplated that the plaintiff and the Mutual Association were to pay for the lease and that that instrument should represent an investment of their funds. This intention was, of course, altered when the Mutual refused to participate in the transaction. At that time the intention was changed so that the funds of the plaintiff alone would be used in consummation of the transaction. Moltzner swore that Slade was at all times familiar with these purposes. For instance, he was asked: "Now, was there any discussion between you and Mr. Slade about where the funds were to come from to pay this $62,000?" He answered: "Why, they were to come out of the associations. It was their investment." Neither Slade nor any other witness who testified on behalf of the defendant denied that Slade knew of the purpose to use the association's funds in paying the purchase price of the lease. Certainly the evidence contains no direct denial of that oft-repeated purpose. Moreover, respondent's brief concedes: "Apparently Slade understood at that time that the Mortgage Investment Company intended that the lease should be transferred to the two associations."

In explaining why the Mortgage Investment Company, rather than the plaintiff, was a party to the instrument of purchase, Moltzner testified: "The Mortgage Investment Company was merely the funnel or intermediary through which the transaction was to be culminated, and that our interest in the lease when the transaction was completed would be merely that of the funnel through which it would pass to these associations after it had been purchased." By "these associations" he meant the plaintiff and the Mutual. It will be recalled that Moltzner swore that he and Slade called upon the corporation commissioner. Moltzner

testified that in the course of that conference he explained to the commissioner that the plaintiff's funds would be used in making payment of the purchase price of the lease. We quote from his testimony: "That was discussed with Mr. Slade and with Mr. McCallister, the corporation commissioner, and I called on Mr. McCallister and Mr. Slade called on Mr. McCallister. Mr. McCallister agreed that the payments should be made and that the record should be set up on the books as investment of the ten per cent of $45,000 approximately in the building and the balance to be carried in fixtures." After this explanation had been made the trial judge asked the witness why the plaintiff was not named in the contract as the purchaser, and received the following reply: "The transaction between the bank and the Mortgage Investment Company, and the State Savings and Loan and the Mortgage Investment Company, and the Mutual Savings and Loan Association and the Mortgage Investment Company, were separate parts of an entire transaction." He added that the Mortgage Investment Company had never intended to use any part of its funds in making the purchase; and went on as follows: "You must understand, however, that we were dealing with three separate corporations, the State Savings and Loan Association, the First National Bank and the Mutual Savings and Loan Association and the Mortgage Investment Company, and it was necessary to keep those corporate entities and their contracts separate. * * * But it was part of the entire transaction, if I make myself clear on that. * * * The original intention, Mr. Ross, was that the State and Mutual Savings and Loan Association should take over that lease." Next, the witness explained that during the conference with the corporation commissioner the latter "said that he still

thought that the Mutual Savings and Loan Association would come in on the transaction and that he would not approve the sale of the Mutual to the people who were then bargaining for it * * * and for us to go ahead and proceed * * *." In a letter, dated October 4, 1930, Mr. Slade wrote to Mr. Moltzner accepting the Mortgage Investment Company's offer to purchase the reserve fund stock of the plaintiff, and adding: "Acceptance of this proposal is part of the whole transaction which involves transfer of lease of the Salem Bank of Commerce Building." Concerning this statement, Slade explained: "It was all involved together because he (Moltzner) would not have bought it if he wasn't buying the State Savings and Loan Association." He next testified that he understood that Moltzner's purpose in taking the lease was to house the two associations (plaintiff and the Mutual) in the building, declaring, "I understood from Moltzner that was his idea." Having so expressed himself, Slade was asked by the trial judge whether any discussion had taken place during the course of the negotiations concerning the plaintiff as the purchaser of the lease, to which he replied: "There was discussion between Mr. Moltzner and myself regarding the consolidated companies going to purchase—when they were going to be sold to the Mortgage Investment Company, regarding the companies taking over the lease in the property at that time, and after the terms—after the agreement of the—after the sale was made of the lease to the Mortgage Investment Company I had no knowledge of the State Savings and Loan Association taking any part in the payment of the obligation. That wasn't discussed." The witness evidently misspoke himself when he said that he had no knowledge that the plaintiff was making payments upon the obligation, for he

later admitted that he knew some of the payments were made by the plaintiff.

We have given Moltzner's version of the conference with the corporation commissioner. The following is Slade's: "He (corporation commissioner) may have come in to the bank and discussed the matter of the Mortgage Investment Company purchasing the State Savings and Loan Association. I have some recollection of his discussing that, but as to any matter of the State Savings and Loan Association assuming any obligation, that was never discussed." Elliott testified that he knew nothing concerning the aforementioned transaction until he was asked to write the plaintiff's check for the initial payment upon the lease. The following, according to his testimony, then occurred: "I went to the corporation commissioner and I asked him if we could pay, obligate the Savings and Loan and pay on a $62,000 leasehold. That was the amount involved in the entire transaction. And he said yes, in this particular instance. And I said it seemed to me it was outside of the law and I was afraid to make— didn't think we should take over—take on this obligation. So the corporation commissioner said that that matter had been discussed with both Mr. Moltzner and Mr. Slade prior to the time the deal was completed and that it had been agreed upon that it could be taken care of by handling a certain portion of it as home office building and the balance of it furniture and fixtures. That was before any payment was made at all." By May of 1931 Mr. McCallister had resigned as corporation commissioner and had been succeeded by Mr. James W. Mott. The financial condition of the plaintiff in the meantime had become such that the new commissioner, in the exercise of the authority conferred by § 25-314, Oregon Code 1930, had instituted an in-

vestigation into its affairs, followed by a letter to the plaintiff demanding that changes specified in the letter be made in the association's financial affairs. From Elliott's reply to the commissioner, we quote, in part, as follows:

"The sum mentioned is the amount paid upon the purchase of a leasehold and for the furniture and fixtures for the Home Office building of the State Savings and Loan Association, less, of course, the sum of $21,000.00, which represents subscriptions for Reserve Fund stock. Before this transaction was entered into both the State Savings and Loan Association officials and the First National Bank received the specific approval of the Corporation Department for the transaction. The Mortgage Investment Company was merely the intermediary through which the transaction was completed."

Moltzner was positive that Slade was familiar with the ten per cent limitation upon investments which building and loan associations can make in the acquisition of property for headquarters purposes. For instance, while he was explaining his anxiety to acquire both local associations because their combined net assets would permit the $62,000 expenditure, he declared, "I might explain by saying that we were both conversant with the building and loan law at that time which required * * *." By "we" he was referring to Mr. Slade and himself. At this point the witness was interrupted by an objection which resulted in a ruling: "Do not state what you were conversant with. Everybody is supposed to understand the law." He then explained: "It was part of the discussion, Your Honor. That is the only reason I brought the matter up, that the limitation was ten per cent of the combined assets of the two associations * * *." No one contends that Slade was unfamiliar with the fact that the

plaintiff's net assets amounted to $426,280.43. Nor did Slade deny the testimony just quoted.

While Slade admitted that he knew the last payments were made with the plaintiff's checks, he claimed that he did not know the source of the first payments. However, as the installments fell due notices were sent by the bank's cashier, not only to the Mortgage Investment Company but also to the plaintiff. Slade and the other bank officials knew that the plaintiff had moved into the building and that the plaintiff was collecting rent from the other occupants. He denied knowledge of the assignment of the lease to the plaintiff.

An instrument, dated August 20, 1931, which describes the plaintiff association as the party of the first part and "the several undersigned" as the parties of the second part, recites: "Money of the party of the first part was used in making payments due from the Mortgage Investment Company to the First National Bank in Salem under said agreement to purchase said lease in the amount of * * *." The "several undersigned" were members of the board of directors of the bank and included Slade. They bound themselves in the several amounts set opposite their names to return to the plaintiff the sum which it had paid to the bank upon the purchase price of the lease. After Slade's signature appears the amount, $2,500. The plaintiff never signed this instrument. Slade explained the reasons which prompted the preparation of the instrument in the following words: "They were demanding certain guaranties regarding that item of an asset they claimed was in the State Savings and Loan Association." "Q. And wanting a refund of it? A. Well, they wanted some guaranty." The execution of this instrument is, we believe, an admission by the

directors that the payments upon the lease were an improper diversion of the plaintiff's funds. Only one or two of the signers made payments and the sums they paid were meager.

After the execution by the bank and the Mortgage Investment Company of the instrument of October 10, 1930, the new officers of the plaintiff, as already stated, moved it into the old banking quarters and took possession of the building. The details are not disclosed, but it appears that monthly someone drew the plaintiff's checks for the rental of $550 due Dr. Steeves, the lessor, and collected rent from the various subtenants in the building. According to Moltzner, "the State Savings and Loan Association collected all the rentals in the building and managed the building and paid for the repairs and the maintenance, and I don't think the Mortgage Investment ever got a five cent piece out of it or ever put anything into it." This condition continued from November, 1930, to November, 1931. In the latter month the corporation commissioner assumed charge of the plaintiff's affairs (§ 25-314, Oregon Code 1930) and it then vacated the building. While the plaintiff was in charge of the structure Elliott, who declined to deem the lease as property of the plaintiff, opened an account showing deposits and checks issued. Deposits exceeded expenditures in the amount of $37.56. However, nothing was paid upon taxes, and the extent to which other charges may have been neglected is not disclosed. The preceding year's taxes were more than $2,000.

November 29, 1930, E. E. Fitzwater, president of the Mortgage Investment Company, wrote to Mr. Elliott, stating: "Referring to the building lease taken in the name of the Mortgage Investment Company, we are today preparing an assignment of the same to the

State Savings and Loan Association. Your association has already paid $10,000 on this account and * * *."
In an instrument, dated December 31, 1930, and signed by the Mortgage Investment Company, that concern assigned the lease to the plaintiff. This instrument was prepared for the plaintiff's signature but the plaintiff did not sign. The letter of transmittal of the Mortgage Investment Company was dated February 25, 1931, but a notation upon the assignment states that it was received by the plaintiff in June, 1931. The instrument merely assigns the lease to the plaintiff; it contains no covenants upon the latter's part. The minutes of the meetings of the plaintiff's directors and stockholders are silent concerning this instrument and the lease.

November 27, 1931, the bank notified the plaintiff that, due to nonpayment of installments required by the instrument of October 10, 1930, it had "elected to declare the said indenture null and void." It resumed possession of the buildings.

April 20, 1934, after the corporation commissioner had returned to the plaintiff control over its own affairs and a new group of directors had been elected, the plaintiff made demand upon the receiver of the bank for repayment to it of the sum of $30,330.88 which, as we have seen, was paid to the bank out of the plaintiff's funds.

No one contends that the plaintiff had need of the entire building; in fact, it had no need for all of the vacant banking quarters which constituted only a part of the ground floor. We observe that on November 6, 1930, about the time the plaintiff was planning to move into the quarters, one of the officers of the Mortgage Investment Company wrote to Elliott, stating: "I talked over with Mr. Fitzwater the various matters

which we discussed yesterday in regard to the space. He informed me that he has arranged for two parties to occupy part of the space. I believe he will have no difficulty in filling up the balance, so I think the thing for you to do is to move in as planned and occupy either the front or the back part of the office as you may desire * * *.'' The plaintiff was a small concern and, apparently, its needs could have been accommodated with space for three or four desks.

The foregoing is, we believe, a fair statement of that part of the evidence which indicates (a) the nature of the transaction of October 10, 1930; (b) the identity of the parties to it; and (c) its legality or the absence thereof. We have omitted mention of the evidence concerning the plaintiff's charge that the bank employed fraud in the transactions. The plaintiff contends that § 25-311, Oregon Code 1930, from which we have quoted in part rendered the transaction illegal. The entire section follows:

"Any such association may purchase at any sale, public or private, any real estate upon which it may have a mortgage, judgment, lien or other encumbrance, or in which it may have any interest, and may lease, sell, convey or mortgage the same at pleasure to any person or persons, but shall not otherwise acquire or deal in real estate; provided, that any such association may acquire such real estate or a leasehold interest therein as may be necessary or convenient for a location for the transaction of its business; provided further, that no such association shall use more than 10 per cent of its net assets in acquiring real estate for its business location.''

We realize that the plaintiff did not sign the agreement of October 10, 1930, and that at that time the Mortgage Investment Company, which signed as purchaser, had not been appointed the plaintiff's agent.

Those circumstances are not incompatible with a purpose upon the part of those who had designs upon the plaintiff to render it liable for the purchase price. Slade knew that the Mortgage Investment Company was a management concern which rendered service for a fee for all building and loan associations under its control. He also knew that its purpose was to appoint itself managing agent for the plaintiff. As a part of the transaction of October 10, Moltzner and his associates in the Mortgage Investment Company obtained control over the plaintiff and contracted with the Mortgage Investment Company for its management service as they had planned to do. They then executed on behalf of that concern the aforementioned assignment of the lease, directed the plaintiff's secretary to move its office equipment into the vacant quarters, to draw checks monthly for the installment payments upon the leases purchase price, and take charge of the entire building. This part of the plan required no previous expression in written contractual form; but all of it had been discussed, we believe, with the bank's representative.

No officer of the plaintiff, with the exception of Slade, knew at the time of the transaction of October 10 the entire plan. None of them knew that Slade had refused to entertain Moltzner's offers unless the profitless lease passed as a part of the transaction. At that time the plaintiff had no interest whatever in the lease and Slade was rendering it no service when he insisted that anyone who bought the plaintiff's reserve fund stock must relieve the bank of the lease and pay to it a sum equal to the loss it sustained when it took over the Bank of Commerce. Slade was the plaintiff's sole representative in these transactions. We are satisfied that he knew that the new group which would assume

control over the plaintiff upon completion of the transaction (listed by name in the offers of April 24 and May 14) would regard the lease as a part of the plaintiff's property and payment of its purchase price as the plaintiff's duty. For instance, he knew that the Mortgage Investment Company, whose home was in Portland, had no need whatever for the vacant banking quarters; that it did not deal in leases and properties; that from the outset it was proposed to house the two associations in that space, not as subtenants but as owners of the leasehold estate; and that when the Mutual rejected the Mortgage Investment Company's offer the plaintiff would have to proceed alone. Not only does the evidence warrant these statements, but the respondent's brief, as we have already shown by a quotation from it, admits "Slade understood at the time the Mortgage Investment Company intended that the lease should be transferred to the two associations." Moreover, as is indicated by the answer made by Slade, quoted in a preceding paragraph, he knew that the two associations, not the Mortgage Investment Company, were to be the purchasers of the lease. We quote his answer again: "There was discussion between Mr. Moltzner and myself regarding the consolidated companies going to purchase—when they were going to be sold to the Mortgage Investment Company regarding the companies taking over the lease in the property at that time * * *."

As we have seen, the Mutual, a few days prior to the consummation of the transaction, declined to become a party to it and then the conference with the corporation commissioner occurred. We realize that Slade's version of the conference does not agree with Moltzner's, nor with the account given by Elliott who obtained his information from others. Nevertheless,

it will be observed that Slade confined his denial ''to any matter of the State Savings and Loan Association assuming any obligation.'' However, that denial was not tantamount to a statement that he was unaware of Moltzner's program to have the plaintiff purchase the lease and pay its purchase price to the bank. Again, when the Mutual Association rejected the offer of May 14, Moltzner stated to Slade and the corporation commissioner that the Mortgage Investment Company's finances would not permit it to proceed, and thereupon the proposal was made that the $62,000 obligation be divided into two parts upon the plaintiff's books so as to give an appearance of legality. No contradiction has been made of those statements nor of Moltzner's declaration that the Mortgage Investment Company would not be responsible for the purchase price.

■■ We are satisfied that Slade knew that the plaintiff, not the Mortgage Investment Company, was the purchaser of the lease, and that it was contemplated its moneys should discharge the $62,000 obligation. The defendant argues that we are bound by the findings of the circuit court, and that those findings preclude such a conclusion. The findings of the circuit court are general only. Article VII, section 3, Constitution of Oregon, cited by the defendant, does not mention findings of facts. Moreover, the outcome in *Johnson v. Ladd*, 144 Or. 268 (14 P. (2d) 280, 24 P. (2d) 17), is a clear indication that the constitutional provision just mentioned has reference only to verdicts based upon substantial evidence—not to those supported by a mere scintilla of evidence. We repeat that, in our opinion, the evidence justifies a conclusion that Slade knew that the plaintiff was the purchaser and that it would be expected to pay for the lease; it affords substantial support for no other conclusion.

■ At the time these negotiations and transactions were taking place Slade represented not only the plaintiff but also the bank. He was the only officer of the bank who conferred with Moltzner and the other representatives of the Mortgage Investment Company. He knew all of the details of the transaction, wrote all of the bank's letters concerning it, participated in all of the conferences, and even supervised the drafting of the final contract—the instrument of October 10, 1930. No citation of authority is needed, under these circumstances, to justify the statement that Slade's knowledge is imputable to the bank.

■ We now come to an application of the aforementioned statute to the facts before us. The defendant argues that, since the plaintiff paid only $30,330.88 upon the $62,000 obligation, that is, less than ten per cent of its $426,280.43 net assets, it did not violate the statutory limitation which provides that an association shall not "use more than ten per cent of its net assets in acquiring real estate." He construes "use" as the equivalent of "disburse" or "expend." But the word also means "employ" or "apply"; and we believe that it is more frequently employed to denote a meaning similar to "employ" than as the equivalent of "expend." The purpose of the part of the statute under consideration is, obviously, to protect associations of this kind against extravagant outlays for home office quarters and to prevent them from speculating in property under the guise of buying a home. Frequently the partial payment for investments renders the transaction of purchase in fact speculative. The membership of associations like the plaintiff is generally composed of thrifty people of limited means who regard the association not only as a place for the safe investment of current savings but also as a source for a

mortgage loan in the event they desire to borrow money for the construction of a home. The latter purpose would be hindered by an association investment accompanied with a large debt of such a nature that it monthly consumed funds which ought to be available for mortgage loans. One who uses his credit is generally using his assets; for the latter, in most instances, is the basis of his credit. We are clearly satisfied that an obligation for an association's business location which will require the expenditure of more than ten per cent of the association's net assets, whether presently made or to be discharged partly in the future, is prohibited by this section of our laws.

■ We come now to the question, did the plaintiff's purchase of the lease constitute acquisition of ''real estate'' within the contemplation of the above statute. It will be recalled that the statute first provides that building and loan associations may purchase real property in which they already possess an interest, and then declares that these associations ''shall not otherwise acquire or deal in real estate.'' This general provision is succeeded by the exception that the association ''may acquire such real estate or a leasehold interest therein as may be necessary or convenient for a location for the transaction of its business.'' We pause to observe that the record contains no evidence that acquisition of a leasehold interest in this five-story-and-basement structure was ''necessary or convenient'' for the transaction of the plaintiff's business. It could use only a small part of the vacant portion of the building. It found itself in possession of the entire building and making payment upon the obligation of October 10 because the Mortgage Investment Company had determined to gain control over the plaintiff's assets, but could not do so unless the bank was relieved of the

burdensome lease. No officer of the plaintiff who had solely its welfare at heart ever found that this building was necessary or convenient as a location for the plaintiff's business. The small amount of space necessary to accommodate the plaintiff's needs is well indicated by the letter to Elliott, previously mentioned, which directed him to move the plaintiff's furniture into the vacant space and informed him that two or three tenants would share the space with the plaintiff. The rest of the ground floor, the basement and the four upper floors were wholly unnecessary to the plaintiff. We repeat that investments in building and loan associations appeal to the thrifty who desire to lay something aside in safe investments for the proverbial rainy day, and that the state, by prohibiting those associations from making costly speculative investments, promotes the welfare of its citizens. The present is a good illustration of the need for stringent safeguards. A concern with several hundred small investors, having need for only one or two offices, found itself undertaking to pay $62,000 for a lease upon a five-story building which was losing more than $4,500 a year. We believe that the purchase of the remaining twenty-nine years of the fifty-year lease was wholly unnecessary to provide the plaintiff with a home.

The above clause of § 25-311, Oregon Code 1930, which imposes the ten per cent limitation employs the term ''real estate'' but not the word ''leasehold.'' It says ''no such association shall use more than ten per cent of its net assets in acquiring real estate for its business location.'' The defendant, after citing *Edwards v. Perkins*, 7 Or. 149, argues that the term ''real estate'' found in the ten per cent limitation clause does not prohibit the purchase of a lease. In the decision just cited, this court said:

''At common law a lease of land for a term of years was a chattel interest and did not descend to the heir, but went to the administrator, and such is the case still unless this rule has been changed by our statute.

''The statute provides for the conveyance of land by deed, and we think embraces only such conveyances as purport to convey a freehold estate such as may descend to heirs, or is for the life of the grantee, and does not include leases which are classed by the statute as personal property (Stat. p. 550, sec. 14). * * * We think it is very evident from these statutes regulating the conveyance and descent of real property, that leases are not embraced in the words 'conveyance of land,' as used in title 1, of chapter VI, and that the provision in section 6, of said title, that 'no covenant shall be implied in any conveyance of real estate,' does not apply to leases.''

But the mere fact that the word ''leasehold'' in its technical legal meaning denotes a chattel real does not necessarily signify that the legislature used the word in that sense when it adopted the above act. Many of the terms employed in the law of real property received their definitions in England during the feudal period, and for many purposes are now regarded as obsolete. For a history of the manner in which a leasehold became regarded as a chattel real, see Williams on Real Property, p. 9 etc. Tiffany, Real Property (2d ed.), § 3, indicates the manner in which the terms ''real estate'' and ''real property'' have come to receive a flexible meaning. We quote from the section just cited the following:

''The courts frequently, however, use the expressions real estate and real property in a broad sense as applicable to any estates in land, whether freehold or less than freehold, as well as to land itself, regarded as the object of rights. And such use of these expressions by the legislatures is exceedingly frequent, partly owing, it may be presumed, to the fact that it corre-

sponds to the ordinary use of the expression 'real estate' among the members of the community generally.''

·Judge Wilkerson, in his carefully prepared opinion entitled *Chicago Auditorium Association v. Cramer*, 8 Fed. (2d) 998, took note of the double meaning of the term ''real estate'' when he held that a lessee could maintain an action to quiet title upon his leasehold estate. He said:

''A lease for a term of years is a chattel real. It conveys an interest in land. While it has some of the attributes of personalty, it is treated in many respects as real estate. People v. Shedd, 241 Ill. 155, 89 N. E. 332.''

■ A lease for years is commonly regarded as an interest in real property and is treated, in many respects, as real property. For instance, in the *United States National Bank of La Grande v. Miller*, 122 Or. 285 (258 P. 205, 58 A. L. R. 339), this court said:

''At the time the deed was made defendant had an interest in the real property described. His interest was a leasehold interest, but was, nevertheless, an interest in real property. A lease is defined by Professor Devlin as 'a conveyance of lands and tenements to a person for life or years.' Devlin, Real Estate (3d ed.), 23, § 13.''

For an annotation upon the subject see 103 A. L. R. 833. Again, in *Barber v. Toomey*, 67 Or. 452 (136 P. 343), the owner of a twenty-five-year real estate lease engaged in many transactions with it, in each instance treating it as real property. In one instance he sold and conveyed, by means of a deed, a half interest in the leasehold. The deed was recorded in the deed records. In another instance he placed a real estate mortgage upon the leasehold to secure payment of a $2,000 mortgage. This instrument was also recorded. In

*Fidelity Trust Co. v. Wayne County*, 244 Mich. 182 (221 N. W. 111, 59 A. L. R. 698), the court stated:

"But, without any good reason therefor, the estate for years continued to be classified as personal property. Mr. Jenks, in his History of English Law, says: 'It stands midway between real and personal property neither wholly real, nor wholly chattel.'

"However, it is in fact, as generally understood, an interest in real property, and, while for the general purposes of the law it retains its common-law classification, courts and legislatures frequently treat it as included in real property."

Although a lease is considered at common law a chattel real the legislature may, nevertheless, regard it as real property and render it taxable as such: *Chicago v. University of Chicago*, 302 Ill. 455 (134 N. E. 723, 23 A. L. R. 244), and *Fidelity Trust Co. v. Wayne County*, supra. Section 69-102, Oregon Code 1930, in describing the property in this state which is subject to taxation, defines the term "real property" thus:

"The terms 'land,' 'real estate,' and 'real property' as used in this act shall be construed to include the land itself, * * * all buildings * * * and improvements erected upon, under or above * * * and all rights and privileges thereto belonging or in any wise appertaining; also any estate, right, title or interest whatever in land or real estate less than the fee simple. * * *"

In *Fidelity Trust Co. v. Wayne County*, supra, the facts were that the plaintiff was the mortgagee of a real estate mortgage executed upon the security of a leasehold. A statute exacted a tax upon the recording of mortgages and liens upon real property. Since the common law regarded leases as personal property, the mortgagee claimed that it was not liable for the tax which, in its instance, amounted to $10,000. The court

declared that for general purposes the Michigan legislature had followed the common law classification of estates for years by deeming them personal property. But, continuing, said:

"As shown in many enactments it has frequently treated such estates as interests in real property, and has brought them within the rules governing the conveyance of real property, * * *"

The decision in the report last cited is accompanied with a notation showing many other instances in which leasehold interests are deemed real property.

■■ The sole problem before us is one of statutory construction: to determine what the legislature meant when it employed the term "real estate." If we can gain from the statute the legislative intent, we must give it effect. To us, it seems that the problem is not a difficult one if we bear in mind that the purpose of all statutes of this kind is to safeguard the investments of the thrifty people of small means who trust building and loan associations. The very fact that the act, of which § 25-311 is a part, goes so far as to restrict the expenditures for operating expenses of these associations to two and one-half per cent of their assets (§ 25-309) shows how carefully the legislature sought to protect the interests of the members of the associations; it was not willing even to trust wholly to the judgment of the associations' directors. In its efforts to render these associations safe, it proceeded further and restricted the investments which they could make. A reading of the entire statute indicates that the legislature favored investments bearing a fixed rate of return. While it authorized investments in notes secured by real estate mortgages, it disfavored investments directely in real property. However, it provided for the associations'

need for business locations through incorporation in the measure of the clause which permits the use of not more than ten per cent of the net assets for the aquisition of a home. Since the entire act is intended to promote security of investment, it would be remarkable if the legislature intended that while an association could use only ten per cent of its net assets in the purchase of a freehold, it could use as much as it pleased in the purchase of a leasehold. The former, once paid for, is an enduring asset although its value may shrink. The latter, even when paid for, not infrequently loses all of its value and becomes a severe burden in the event the income from the lease becomes less than the outgo. The present instance is a good illustration. The landlord still owns his property and is solvent, but both the plaintiff and the bank suffered severe losses in endeavoring to handle the leasehold, and both became insolvent. The purchase of this lease, as we have seen from the authorities above reviewed, was the purchase of an interest in real property. The authorities above reviewed also show that in the interpretation of statutes the term "real estate" is frequently construed as including a lease. It is not strange that the clause of the statute which imposes the ten per cent limitation does not follow the term "real estate" with the word "leasehold" since the legislature very likely believed that the former would be construed as including the latter. We conclude that the ten per cent limitation is applicable to the purchase of a leasehold as well as to the purchase of a freehold.

■ We have not overlooked the fact, as the defendant points out, that 1931 Session Laws, chapter 373, § 49, subd. "f" which succeeded the statute above mentioned, declares:

"Provided further that no such association shall invest or obligate itself to invest more than ten per cent of its net assets in the total cost of real estate and improvements thereof for its business location."

However, chapter 373 is an entire restatement of the Building and Loan Association Act. It repeals §§ 25-301 to 25-334, inclusive, Oregon Code 1930. Ordinarily, the adoption of an amendment is an indication of a desire to make a change in the existing law, but, upon the other hand, the occasional change of a word or two in an obscure clause, incidental to the redrafting of an entire code, may be nothing more than an effort to make clearer that which has already been written. Such, we believe, is true in the present instance. We adhere to the interpretation placed upon this act in the preceding paragraphs.

The defendant argues that the plaintiff's former possession of the building and its acts in making payments upon the contract estopped it from presenting the issue of ultra vires. However, it was not a mere limitation found in the plaintiff's charter powers that rendered the plaintiff incapable of using its funds in the above manner, but the prohibition contained in a statute of this state. The plaintiff's effort to acquire this lease was illegal as distinguished from ultra vires: Fletcher, Cyclopedia of Corporations, § 1611, and Thompson on Corporations (3d Ed.), § 2827. The statutory limitation which was violated in this transaction was enacted for the protection of the members of building and loan associations. When the purpose of a statute which was violated in a specific case is the protection of a favored class—the association membership in the instant case—recovery of sums paid under the illegal contract is generally permitted (Thompson on Cor-

porations (3d Ed.), § 2853; Fletcher, Cyclopedia of Corporations, §§ 1618 and 1625; and 14a, C. J. Corporations, p. 310, § 2159); otherwise the favored class would become the victims of the very statute which was enacted for their protection. The bank does not claim that its interests were prejudiced by anything which was done under this contract. It was, in fact, greatly benefited by being relieved of the payment of rent under the unprofitable lease, and it now possesses $30,330.88 which, in equity and good conscience, it ought not be permitted to retain.

It follows from the above that the judgment of the circuit court is reversed. The plaintiff should have judgment in accordance with its prayer, less, however, the offset authorized by the noncontested counterclaim.

BEAN, C. J., and RAND and LUSK, JJ., concur.