Argued and submitted December 8, 1981, affirmed June 9, 1982

SHEPHARD et al,
*Petitioners on Review,*

*v.*

DEPARTMENT OF COMMUNITY CORRECTIONS
OF WASHINGTON COUNTY OF THE
STATE OF OREGON,
*Respondent on Review.*

(CA 19850, SC 28030)
646 P2d 1322

Angelo Gomez, Oregon Legal Services Corporation, Hillsboro, argued the cause and filed the briefs for petitioners on review.

John M. Junkin, Assistant County Counsel, Washington County, argued the cause and filed the brief for respondent on review.

LENT, J.

Tanzer, J., concurred and filed opinion.

## LENT, J.

The broad issue is whether a month-to-month residential tenant is entitled to relocation assistance under ORS 281.045 to 281.105 from a county which obtains a leasehold interest from the residential landlord, who, upon leasing to the county, terminates the month-to-month tenancy in order to carry out the terms of the new lease.[1] The resolution of that issue depends upon whether the county effected an "acquisition of real property" within the meaning of those statutory sections. We hold that there was no "acquisition"; therefore, there is no entitlement to assistance.

The landlord owned two houses near the Washington County Courthouse. As early as mid-November, 1979, Washington County[2] began to consider obtaining a

---

[1] ORS 281.060 is the section actually providing for payment of relocation assistance and provides as follows:

"Whenever any program or project is undertaken by a public entity which program or project will result in the acquisition of real property, notwithstanding any other statute, charter, ordinance, or rule or regulation, the public entity shall:

"(1) Provide fair and reasonable relocation payments and assistance to or for displaced persons as provided under sections 202, 203, 204 and 206 of the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970;

"(2) Provide relocation assistance programs offering to displaced persons and others occupying property immediately adjacent to the real property acquired the services described in section 205 of such federal Act on the conditions prescribed therein;

"(3) In acquiring the real property, be guided by the land acquisition policies in section 301 and the provisions of section 302 of such federal Act;

"(4) Pay or reimburse property owners for necessary expenses as specified in sections 303 and 304 of such federal Act;

"(5) Share costs of providing payments and assistance with the Federal Government in the manner and to the extent required by sections 211(a) and (b) of such federal Act; and

"(6) Appoint such officers, enter into such contracts, utilize federal funds for planning and providing comparable replacement housing, and take such other actions as may be necessary to comply with the conditions and requirements of such federal Act."

[2] The respondent named in the title of this case was Washington County's Department of Community Corrections. The case has proceeded throughout, however, on the basis that the county is the true respondent. Indeed, in the "RESPONDENT'S BRIEF" in the Court of Appeals, the county is specifically referred to as "respondent County."

leasehold interest in the houses for the purpose of operating a "Restitution Center of the Department of Corrections" of the county. Thereafter, newspaper articles were published concerning the matter, and personnel of the Corrections Department came to the property to discuss alterations planned in order to house the Restitution Center.

Prior to November, 1979, petitioners were month-to-month tenants of "apartments" located in the two houses. Petitioners' periods of residence were approximately as follows: Davis, eleven years; Curfman, eight years; Shephard, five years; Birlew, three years; and Gill, ten months. These tenants had been paying a total monthly rental of about $417.

Petitioners Birlew and Curfman learned of the negotiations between the county and the landlord through newspaper articles and of the Department's plans for physical alterations through on-site observation. Those petitioners, respectively, moved from their apartments on December 1 and 3, 1979. Each swore that she did so because:

"During the year 1979, I became aware that the above property was to be obtained by Washington County to operate as the County Restitution Center. Since I did not know when I would be forced to move I became apprehensive that I would be required to move on short notice. So I decided to move when I had the opportunity."

On February 19, 1980, the county and the landlord entered into a five-year lease of the buildings, providing for a monthly rent of about $1,500. The term of the lease was to commence on March 1, 1980, and the county was entitled to possession on that date "subject to occupancy of present tenant being a month-to-month tenancy."

On February 21, 1980, the landlord gave to petitioners Shephard, Gill and Davis the statutorily required 30-day notice[3] to terminate their month-to-month tenancies, stating in part:

---

[3] ORS 91.070 requires not less than 30 days' written notice to terminate a month-to-month tenancy and requires designation of the final date. The notice given here did not allow a full 30 days, but no party has to this point raised any question about that.

"The County has leased the * * * house you are renting and will be taking possession as of March 1, 1980. This is notice, therefore, that you will have to vacate the premises by March 21, 1980. If you have any questions you may call * * * the Department of Community Corrections * * *."

"The rent which is currently due and owing up to March 1, 1980 should be paid to [landlord]. Rent from March 1, 1980 forward should be paid by you to the County. * * *"

The county and the landlord agreed that the county would not take "actual possession" until early April, 1980, and the county did take possession on April 10, 1980. Petitioners Shephard, Gill and Davis, respectively, vacated on March 15, April 2 and March 12, 1980, and each has sworn that she did so because of the notice "and because the County was to take possession to operate the property as the Restitution Center."

On May 27, 1980, petitioners presented written "formal administrative claim for relocation assistance" to the respondent Department. The county's Board of Commissioners (Board) was apprised of the claim on June 10, 1980. On June 23, 1980, the claim was denied in a letter to petitioners' counsel, assigning as sole reason:

"The request for assistance is denied. Those statutes under which assistance was requested (ORS 281.060 et seq.) are not applicable to the instant situation. There has been no 'acquisition of real property' by the County by reason of the renting of the building which previously housed your clients. The County is merely a tenant in the building with ownership remaining unchanged."

Pursuant to ORS 281.085, petitioners requested a hearing; thereafter, the Board held a hearing on December 11, 1980. ORS 281.085 provided that the hearing be "substantially of the character required" in contested cases under the Oregon Administrative Procedures Act, ORS 183.415 to 183.470. The latter section requires that the agency make findings of fact and conclusions of law. The Board, under date of December 17, 1980, ordered that petitioners' claims for relocation assistance be denied upon the basis of the facts found and conclusions of law stated as the basis for the order. The facts were stipulated.

The Board's conclusions of law were two in number. The first was that the county did not acquire real property. The final sentences of the conclusion were:

"When the County entered into the lease agreement no title passed and no real property was acquired. Therefore, the statute does not apply."

The second conclusion of law was that the lease agreement did not result in petitioners becoming displaced persons within the meaning of the statute, ORS 281.045(1):

" 'Displaced person' means any person who on or after September 13, 1975, moves, or is required to move his or her residence and personal property incident thereto * * * as a result of:

"(a)  Acquisition of the real property, in whole or in part, by a public entity; or

"(b)  Receipt of a written order by such person from a public entity to vacate the property for public use."

In elaboration of this second conclusion, the Board wrote that the possessory interests of the petitioners were terminated by the landlord by giving the "30-day-vacate notices" and, therefore, petitioners were only "former tenants of the houses."

ORS 281.085 provides for judicial review of such an order as provided in ORS 183.480, and petitioners invoked the jurisdiction of the Court of Appeals under those sections.

In their opening brief in the Court of Appeals, petitioners assigned as error the Board's interpretation of the law, arguing that the acquisition of the leasehold was the acquisition of real property within the meaning of the statutes and that upon the facts found by the Board they were "displaced person[s]" as a matter of law. Respondent answered that the acquisition of a leasehold was not an acquisition of "real property" and that the cause of petitioners' move was the termination of their tenancy by the landlord and, accordingly, "was not the result of any acquisition of real property by respondent."

In exercising judicial review of an order in a contested case, the court is governed by ORS 183.482(8)(a), which provides:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

The Court of Appeals heard oral argument on June 4, 1981, and, without opinion, affirmed the Board's order on July 13, 1981. We allowed review under ORS 2.520, 291 Or 708 (1981), to consider whether the Court of Appeals affirmed an erroneous interpretation of a provision of law by the Board. We were concerned primarily with the Board's interpretation, apparently approved by the Court of Appeals, that real property within the relocation assistance statutes does not include a leasehold. That issue has importance beyond the resolution of this particular case.

It is apparent that from the beginning of these claims for relocation assistance that the Board has proceeded on an interpretation of ORS 281.045 to 281.105 that a leasehold interest is not real property as that term is used in those sections. That appears from the June 23, 1980, denial of the claim and has been continuously asserted by the respondent from that time forward. The Board appears to have reasoned that there was no acquisition by the county of real property because "title" to the land and improvements did not pass to the county. We turn first to the validity of that reasoning, for if it be sound the issue is settled. On the other hand, if the reasoning be unsound, further inquiry will be necessary, for the Board could be right in its conclusion that the county did not acquire real property, even if the wrong reason for the conclusion has been advanced.

Rather than providing a definition of "real property" in so many words in ORS 281.045, the legislature chose to define the term by reference to another statute:

" 'Real property' or any interest therein means 'lands' and 'estate and interest in lands' as defined in ORS 95.010."

ORS 281.045(5). ORS 95.010(1) and (2) provide:

> " 'Lands' includes tenements and hereditaments.
>
> " 'Estate and interest in lands' includes every interest, freehold and chattel, legal and equitable, present and future, vested and contingent, in lands."

This borrowed definition is not a definition at all; rather than stating what the term or terms attempted to be defined mean, ORS 95.010 is couched in terms of inclusion, i.e., those things which are included. Nothing tells us that the list is exhaustive.

In these circumstances, we look to the purpose of the statute. ORS 95.010 is contained within a set of statutes designed to prohibit fraud upon creditors. The obvious design of the set was to prevent conveyances for the purpose of defrauding creditors, and it appears that the legislature sought to employ the broadest concept of interests in realty within the terms chosen to carry out its purpose of preventing fraud. That concept was chosen for the purposes of ORS 281.045, and we perceive that our duty is to interpret that section in the same sense.

The record shows that the respondent acquired a term of years in the landlord's property, and the preliminary question is whether a term of years is real property within the meaning of ORS 95.010. In the early part of the thirteenth century in English law, the term of years was not an estate in land. By the end of the fifteenth century, the tenant of such a term was recognized as having a property interest in the land, although that interest was not a freehold. The term of years was a device to evade the strict prohibition against usury. The tenant desired that his interest be one which he could bequeath and, thereby, the security for the loan from tenant to freeholder be not destroyed by the death of the tenant prior to the expiration of the term. *See,* Restatement (Second) of Property, Landlord and Tenant, Introduction, pp 1-4. *See also,* I American Law of Property, § 1.11, p 19:

> "The extraordinary conclusion that a lease for years is a chattel may have resulted from the fact that terms of years were often used as security for debts. Thus, the lender might very well wish to bequeath his security on his death, a thing which was possible with respect to chattels but not with respect to freehold interests in land."

The tenant's interest became known as a chattel real.

It is seen that ORS 95.010(2) specifically lists a chattel interest in lands as being within the term "Estate and interest in lands." Consequently, that is carried over into the definition of "real property" as that term is used in ORS 281.045.[4] We believe that it follows that obtaining a tenancy for a term of years is to acquire real property, and the respondent's Board therefore "erroneously interpreted a provision of law," ORS 183.482(8)(a), when it based its decision on the circumstance that a term of years, rather than "title," to the realty was purchased by the county.

Our holding that the county has erroneously interpreted a provision of law does not end our task, for the statute enjoins the court to find whether a "correct interpretation compels a particular action." ORS 183.482(8)(a). While not raised in so many words, the issue whether there was an "acquisition" of real property has inhered in this case from the beginning, and we now shall address that issue.

If one ignores the history and setting of this legislation, one could readily conclude that "acquisition" means just what the dictionary says it means: "the act or action of acquiring." Webster's Third New International Dictionary, 1976. The same source informs us that "acquire" means "to

---

[4] Petitioners have invited us to rely upon *United States Nat. Bank v. Miller et al*, 122 Or 285, 258 P 205 (1927), for the proposition that a leasehold is an interest in real property. We decline because our holding in that case was not concerned with the statutory definition involved in the case at bar. Moreover, our statement in that case that a "leasehold interest * * * was * * * an interest in real property" was on the authority of a textwriter's definition of a lease as being a "conveyance of lands and tenements to [misquoted as 'tenants by' in our opinion] a person for * * * years." 122 Or at 289, 258 P at 207. In the same section from which we quoted, the textwriter gave other definitions that were not completely consistent with each other.

Our attention has also been directed to *State Sav. and Loan Ass'n v. Bryant*, 159 Or 601, 81 P2d 116 (1938), where we stated that a lease for years was "commonly regarded as an interest in real property and is treated, in many respects, as real property." 159 Or at 631, 81 P2d at 128. We were there concerned with a statutory prohibition against a savings and loan association committing more than a certain percentage of its assets to the purchase of "real estate" to house its offices. We were careful to note that our specific inquiry was whether the legislature intended "real estate" to include a leasehold. The question in the case at bar is not whether a leasehold is "commonly regarded" or "treated" as an interest in real property but, rather, is whether the statutory definition in ORS 281.045 includes a leasehold.

come into possession, control, or power of disposal of often by some uncertain or unspecified means" and that synonyms are "get, obtain, procure, secure," etc. There is no doubt that the respondent county effected an acquisition of the leasehold in that dictionary sense.

The genesis of this state's adoption of relocation assistance legislation was House Bill 1933, introduced in the 1971 session by the Urban Affairs Committee at the request of the Portland Development Commission, which was the urban renewal agency for the City of Portland. Both the text of the bill and the explanation given to the committee by the lawyer for the Development Commission reveal that the bill was drawn and introduced in response to the Uniform Relocation Assistance and Real Property Acquisition Act, Pub. L. No. 91-646, then quite recently enacted by Congress. Enactment of the state legislation was necessary in order to use federal funds to be made available for relocation assistance. To like effect was the testimony of the other witnesses on the committee's hearing on House Bill 1933.

Legislative history shows further that the bill as originally envisioned by the Development Commission would have added a single new section to ORS chapter 281. That chapter, from the enactment of ORS in 1953, was entirely concerned with condemnation of property for public use. The state highway department had been consulted about the effect of the bill prior to its introduction, and that department had requested the addition of other sections, which "grew out of its experience with their [highway department's] legislation which was very similar to the relocation Act." Minutes, House Urban Affairs Committee, March 16, 1971. As a consequence of the consultation between the Development Commission and the highway department, Sections 3, 4, 5 and 6 were added to the bill prior to introduction, but Section 1 required that only Section 2 be made a part of ORS chapter 281. Upon passage of House Bill 1933, Sections 2 through 6 were all made a part of ORS chapter 281, being numbered, respectively, ORS 281.060, 281.070, 281.080, 281.090 and 281.100. The chief feature of the bill, i.e., Section 2, designed to permit use of federal funds, was numbered ORS 281.060.

In 1973, that section was amended to permit the state and specified political subdivisions to provide relocation assistance as "provided" rather than as "required" by the "Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970."

In 1975, legislation was introduced in response to the displacement and relocation of a large number of residents by reason of the expansion of a major hospital in the City of Portland. The vehicle was House Bill 2423, and one of its chief sponsors explained the bill in formal testimony before the House Committee on State and Federal Affairs on March 5, 1975, as the committee minutes reveal:

> "*REP. KAFOURY* explained the intent of the bill. The bill provides for 1) funds for relocation assistance, 2) eliminates quick *taking* of private property, 3) sets up community advisory boards, 4) takes care of tenants who are forced to move because their landlord won't fix up the dwelling to meet the housing codes, and 5) provides for adequate displacement of housing before the house is taken. *Rep. Kafoury stated that he is not so concerned with the right of eminent domain but how it is administered.* The bill is aimed at seeing that what has happened in the past does not happen again as far as removing people from their homes and not have suitable housing to move into. He also stated that this brings Oregon's laws concerning this subject into conformity with the federal laws." (Emphasis added)

The minutes show that other testimony in favor of the bill was by persons who were concerned with displacement of residents by urban renewal projects and specific site acquisition by public entities of comparatively large tracts of land. One proponent witness, the Deputy Director of the Legal Aid Service of Multnomah County, in providing background for the bill, discussed the history of relocation assistance programs and said in part:

> "These [programs and urban activities] amounted to a frank admission that the impact of private property acquisition *under the threat of eminent domain* is to be measured not only by the property and property damage value, but also by the impact on the people directly involved." (Emphasis added)

Continuing his testimony, he referred to a 1974 report, "Planning for Housing People in Oregon," prepared by the

Housing Division of the Department of Commerce. He quoted from that report:

"Cities affect the supply of housing *through the use of the powers of condemnation. Condemnation* of housing for health and safety reasons, or to make way for utilities, streets or public service facilities is common. Governments must realize that, in doing so they are placing a burden on the lower-income families that could use existing housing. *Each action of condemnation* ought to include some serious consideration by the governmental body involved." (Emphasis added)

The witness presented further testimony that, while it did not center upon condemnation as the means of acquisition, showed that the witness believed the necessity of the legislation to be compensation to those residents displaced by urban renewal, redevelopment projects, open space preservation and "constructing new public facilities."

At a later time, April 11, 1975, the same witness from the Legal Aid Services told the committee:

"that this bill only addresses itself to the costs in addition to the appraised value of the property."

The bill was amended in both the House and Senate and in the form in which it was presented to the Senate for passage, it was summarized as follows:

"Defines 'displaced persons,' 'person,' 'public entity,' 'public use' and 'real property.' Requires, *in renewal of neighborhoods,* public entity make all reasonable efforts to insure that displaced persons have option to remain in their neighborhood. Prohibits displacement unless displaced persons provided 90 days' written notice and notification of costs and allowances to which they may become entitled. Requires review of grievances stemming from displacement activity. Gives Housing Division responsibility for approving any rules and regulations necessary to carry out Act. Requires public entity to provide all fair and reasonable relocation payments and assistant [sic] authorized under certain federal laws and additional assistance to adjacent property owners." (Emphasis added)

The bill was enacted into law, Or Laws 1975, ch 613, and made a part of ORS chapter 281.

We note that the right to relocation assistance from the original legislation in 1971 to the present depends

upon the undertaking of a "program or project." ORS 281.060, quoted in full in n. 1, *supra,* provides in part as follows:

"Whenever any program or project is undertaken by a public entity which program or project will result in the acquisition of real property * * *."

We believe use of those terms indicates a legislative concern with something more than the rental of a modest amount of office space.

The setting and history of the legislation indicate that the sponsors of the 1975 legislation were concerned with social and economic problems arising out of disruption of neighborhoods and displacement of persons on a relatively large scale by reason of the undertaking of public projects of some considerable magnitude. All of the examples given in testimony before the legislative committees so indicate. The legislature responded by providing for alleviation of the financial burdens of persons displaced by the kind of governmental acquisitions of real property in which resort to condemnation proceedings would be at least a strong possibility if an arm's length purchase could not be accomplished.

The foregoing gave rise during oral argument in this court to the question whether a predicate for the right to relocation assistance was that the property be acquired by condemnation. The language of the legislation does not so state, and the statutes imply that the actual use of the power of eminent domain is not necessary to trigger the right to assistance.

ORS 281.060(3) commands that in acquiring real property the public entity be guided by certain sections of the federal law. We find that those sections strongly favor acquiring property necessary to federal programs by negotiation. The applicable section, 42 USC § 4651, expresses the following policies:

"(1) The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

"* * * * *

"(8) If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of

the Federal agency concerned shall institute formal condemnation proceedings. No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."

■ We hold that actual exercise of the power of eminent domain is not a prerequisite to the validity of a claim for assistance.

■ We find nothing in the history or setting of this legislation to indicate that the legislature envisioned relocation assistance for month-to-month tenants who might be displaced in every situation where a governmental agency acquires a leasehold interest in a modest amount of floor space. To come to the conclusion that the legislature intended to require assistance in such circumstances would mean that a governmental agency could shop on the open market for rental space only in vacant properties unless the agency were willing and able to commit a disproportionate amount of public funds to the acquisition of a lessee's interest in realty.[5]

As we have noted above, history indicates that this legislation was concerned with projects or programs for urban renewal, redevelopment, open space preservation and construction of public facilities. Such projects are usually site specific; that is, the governmental agency sets out to acquire certain property for the program. Only properties considered to be economically blighted are usually thought of as being targeted for urban renewal or redevelopment. Open space preservation programs are not ordinarily carried out by the destruction of improvements to land in areas

---

[5] The record in this case, for instance, shows that the county agreed to pay approximately $90,000 in rent over the period of the lease, and that expenditure would be increased considerably if the county had to provide relocation assistance to these claimants. Their claims for benefits are as follows:

| | |
|---|---|
| Shephard | $4,500 |
| Gill | 4,500 |
| Birlew | 620 |
| Davis | 4,500 |
| Curfman | 3,596 |
| TOTAL | $17,716 |

Additionally, each has made claim for $4,500 for general damages for failure of the county to provide her with a relocation assistance advisory program.

already developed and unblighted; rather, such programs do just what they are described as being; they preserve open space where it exists or where it may result through the process of renewal, redevelopment or natural disaster.

In the case at hand, the record does not disclose that the county was determined to obtain this specific rental space in this particular parcel of land. It is true that the record shows the land to be near the county courthouse and suited to the county's purposes in operating its restitution center, but there is nothing to indicate that the county would not have sought rental space in some other parcel had it been unable to come to a satisfactory agreement with the owner of these two houses. There is nothing to indicate that had negotiations failed the county would have resorted to condemnation proceedings to acquire the specific site to operate the center.

We conclude that there was no "acquisition" of real property in this case in the sense in which that word is used in this legislative set.

That holding makes it unnecessary for us to determine whether under the undisputed facts it must be concluded that any one of these claimants was within the definition of "displaced person."

Affirmed.

**TANZER, J.,** concurring.

It is clear from the legislative history that ORS 281.045 through 281.105 were added to Oregon's laws regulating condemnation with the intent of ameliorating some of the harsh consequences of the exercise of eminent domain for large new public programs which require the taking of large amounts of private land, such as urban renewal. The majority opinion is somewhat timid on this point, construing the statutory word "acquisition" to apply only to specific site acquisition because new programs are usually site specific. It deems site specificity controlling because it is an attribute of condemnation transactions. If the goverment is determined to obtain specific property, then condemnation is either employed or it is explicitly or

implicitly threatened. It is preferable to straightforwardly articulate the rationale which the majority necessary implies: that "acquisition," as used in ORS 281.045(1)(a), occurs where the government program obtains property by condemnation or where condemnation would be resorted to if agreement were not reached.